Javier L. Merino
Marc E. Dann (pro hac vice anticipated)
The Dann Law Firm, PC
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

*Additional counsel listed in signature block below*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **VR CONSULTANTS, INC.**, individually and on behalf of all those similarly situated, | Civil Action No.: |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT FOR DAMAGES** |
| **JP MORGAN CHASE & CO.**, and **JP MORGAN CHASE BANK, N.A.**, | |
| Defendants. | **JURY DEMAND ENDORSED HEREON** |

Plaintiff VR Consultants, Inc. ("VR Consultants" or "Plaintiff"), individually and on behalf of all those similarly situated, through counsel, states as follows for its complaint against Defendants JP Morgan Chase & Co. ("Chase & Co.") and JP Morgan Chase Bank, N.A. ("Chase Bank") (collectively, "Chase"):

### PARTIES, JURISDICTION, AND VENUE

1.      VR Consultants is a small business corporation, incorporated in 1999 in New Jersey with its principal place of business in New Jersey. VR Consultants specializes in providing information technology solutions and management consulting.

2.      Chase & Co. is an American multinational investment bank and financial services holding company incorporated in Delaware with its principal place of business in New York.

3.      Chase Bank N.A. is a federally chartered National Banking Association that is organized and exists under the National Banking Act, with its principal place of business located in New York. Chase Bank is a wholly owned subsidiary of Chase & Co.

4.      Chase engages in commercial banking across the United States and in the State of New Jersey, including the loan application at issue with VR Consultants. Chase regularly engages and transacts substantial business across the State of New Jersey.

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1) as VR Consultants is a citizen of New Jersey, Chase is a citizen of New York and Delaware, and the amount in controversy is greater than $75,000.00.

6.      In the alternative, the Court has original jurisdiction over this Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) at least some members of the proposed Class have different citizenship from Defendant(s); (2) the proposed class consists of more than 100 persons or entities; and (3) the claims of the proposed Class Members exceed $5,000,000 in the aggregate.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District given that VR Consultants applied for the subject Paycheck Protection Program ("PPP") loans while in this District and Chase marketed, promoted, and took applications for the PPP loans in this District.

## FACTUAL ALLEGATIONS

### The COVID-19 Pandemic and the CARES Act

8.      On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency over COVID-19. On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency, beginning March 1, 2020.

9.      In an effort to curb the spread of COVID-19, governors in many states have enacted so-called "shelter in place" or "stay at home" orders which require residents to engage in "social distancing."  For example, on March 21, 2020, Governor Phil Murphy issued an executive "Stay at Home Order" in the State of New Jersey in order to slow the spread of COVID-19.  These social distancing measures include requiring certain individuals to work from home, widespread cancellation of events, cancellation of classes (or moving in-person to online classes), reduction of travel, and the closure of businesses.

10.      As would be expected, the COVID-19 pandemic, as well as the social distancing requirements enacted in response thereto, have led to a dramatic reduction in economic activity, both globally and in the United States.  On March 20, 2020, Goldman Sachs predicted the U.S. gross domestic product would "decline by 24% in the second quarter of 2020 because of the coronavirus pandemic".[1] Deutsche Bank predicted the U.S. economy would shrink by 12.9% in the second quarter of 2020.[2]

---

[1] Reinicke, Carmen. "Goldman Sachs now says US GDP will shrink 24% next quarter amid the coronavirus pandemic—which would be 2.5 times bigger than any decline in history". *Markets Insider*. https://markets.businessinsider.com/news/stocks/us-gdp-drop-record-2q-amid-coronavirus-recession-goldman-sachs-2020-3-1029018308.

[2] Winck, Ben. "The worst global recession since World War II: Deutsche Bank just unveiled a bleak new forecast as the coronavirus rocks economies worldwide". *Markets Insider*. https://markets.businessinsider.com/news/stocks/coronavirus-recession-worst-wwii-economic-recovery-global-deutsche-bank-2020-3-1029012757

11.     To ameliorate the negative economic impact of COVID-19, the Senate unanimously passed the *Coronavirus Aid, Relief, and Economic Security Act* ("CARES Act")—commonly known as "Phase Three" of the coronavirus economic relief packages—on March 25, 2020. On March 27, 2020, the House of Representatives passed the CARES Act by voice vote. President Trump signed the bill into law that same day.

12.     The CARES Act was intended to provide much needed financial support to individuals, businesses, and hospitals in response to the economic distress caused by the COVID-19 pandemic.

### The PPP

13.     In recognition of the important role small businesses[3] play in the U.S. economy, the CARES Act created the PPP.

14.     The PPP is a $349 billion loan program for small businesses suffering from the COVID-19 pandemic which permits them to borrow money equivalent to 2.5 times their average monthly payroll.  These PPP loans are designed to enable small businesses to continue to meet their financial obligations relative to, *inter alia*, (i) payroll costs, (ii) continuation of health care benefits, (iii) employee retirement benefits, (iv) mortgage interest obligations, (v) rent, and (vi) utilities during the COVID-19 pandemic.

15.     Although the PPP is nominally a loan program, it is, for many small businesses, a direct subsidy from the government.  This is because the PPP largely (or entirely) eliminates the obligation to pay back borrowed amounts through loan forgiveness, so long as a small business uses the borrowed funds for the purposes articulated above, and does not reduce its workforce.

---

[3] As used in the CARES Act, the term "small business" generally refers to businesses with 500 or fewer employees, including nonprofits, veterans organizations, tribal concerns, self-employed individuals, sole proprietorships, and independent contractors.

16.     Given the PPP's generous criteria for loan forgiveness, and the fact that PPP loans are guaranteed by the United States Small Business Administration ("SBA"), the prospect of obtaining a PPP loan was extremely enticing to many American small businesses.  This, coupled with the sheer size of the program, required privately owned banks to administer the PPP.  In short, under the PPP, privately owned banks, such as Chase, were responsible for processing small businesses' PPP loan applications and originating small businesses' PPP loans.  In exchange, these banks earned origination fees based on the amount of each PPP loan it originated.

17.     Specifically, (1) for PPP loans less than or equal to $350,000, a bank was to receive a 5% origination fee, (2) for PPP loans greater than $350,000 but less than or equal to $2 million, a bank was to receive a 3% origination fee, and (3) for PPP loans greater than $2 million, a bank was to receive 1% origination fee.

18.     On April 2, 2020, the SBA issued its Interim Final Rules relative to the PPP ("Rules").  Pursuant to the Rules, the PPP was to be "first-come, first-served."  *See*, Rules, Section III-2-m.[4]  As such, banks, such as Chase, were required to process PPA loan applications in the order that they were received.

19.     The $349 billion from the PPP was fully allocated within thirteen (13) days.

20.     On April 24, 2020, President Trump signed the Paycheck Protection Program and Health Care Enhancement Act ("Phase 3.5").[5]  Phase 3.5 appropriated an additional $321 billion in additional funding to replenish the PPP. The SBA resumed accepting PPP loan applications on April 27, 2020.

---

[4] The Rules have yet to be published in the Federal Register, but are available on the United States Department of the Treasury's website at: https://home.treasury.gov/system/files/136/PPP--IFRN%20FINAL.pdf (last visited April 27, 2020).
[5] https://www.sba.gov/about-sba/sba-newsroom/press-releases-media-advisories/joint-statement-sba-administrator-jovita-carranza-and-treasury-secretary-steven-t-mnuchin-resumption (last visited May 19, 2020)

*Chase's Administration of the PPP*

21.    The PPP application process for small businesses opened on April 3, 2020 with Chase as one of the privately-owned banks responsible for processing PPP loan applications and originating PPP loans.

22.    Consistent with the Rules, Chase represented (and continues to represent) to applicants for PPP loans that their applications would be processed and that "funds will be loaned on a first-come, first-served basis."[6]

23.    In reliance on Chase's representations, hundreds of thousands of small businesses—including Plaintiff and members of the Class (defined below)—reasonably believed that Chase would process their PPP loan applications on a "first-come, first-served" basis and submitted their applications as soon as they could.

24.    However, contrary to Chase's representations and the Rules, Chase did not process PPP applications and distribute funds on a "first-come, first-served" basis.  Instead, Chase employed a two-tiered program that prioritized its wealthiest clients' PPP applications—*i.e.*, clients with at least $10 million in assets or customers who had gotten loans through JPMorgan's commercial bank, another subsidiary of Chase & Co.[7]—before it would process PPP loan applications from smaller, less wealthy clients—such as Plaintiff and the members of the Class.

25.    As part of this two-tiered system, Chase's smaller clients—such as Plaintiff and the members of the Class—were required to submit "preliminary requests"—through a slow, backed-up online portal, which "was only sporadically accessible"—to even have the *opportunity* to apply for PPP loan applications.[8]  Only after Chase approved its smaller customers' "preliminary

---

[6] https://privatebank.jpmorgan.com/gl/en/insights/planning/small-business-owners-cares-act-faq (last visited April 27, 2020)

[7] https://www.nytimes.com/2020/04/22/business/sba-loans-ppp-coronavirus.html (last visited April 27, 2020)

[8] *Id.*

requests" could they actually submit PPP loan applications, and even then, were required to use the same slow, inefficient online portal.

26.     In contrast, Chase assigned employees to provide personalized attention and "concierge treatment" to its wealthiest customers.[9]  According to a Chase employee who "was assigned to [Chase's wealthiest] customers to shepherd their applications through the [PPP loan application] process," Chase's wealthiest customers "never had to wait for an online portal [and] never found themselves in a backed-up queue."[10]

27.     This two-tiered system—where wealthy applicants were moved ahead in line—was in place at Chase as soon as the SBA began accepting PPP loan applications.[11] In fact, shortly before the PPP application process opened, leaders of Chase's retail bank hosted a nationwide conference call to provide workers with directions on how to handle customers.[12]

28.     On that conference call, Chase's high-level managers "told branch employees who normally dealt with customers not to get involved in the PPP application process.[13] If [small] business owners called to ask about their [PPP loan] applications—even if they were well-known customers—employees were to tell them not to worry, that their applications were in a queue and would be processed as quickly as possible."[14]

29.     In other words, Chase instructed its employees to ignore the plethora of telephone calls and emails from long standing small business customers (who thought that their relationships with branch managers and bankers would get them some personal help), while at the same time

---

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

giving the kind of personal attention to its wealthiest customers that the small business banking customers had sought but were denied.

30.     Chase's employment of the aforementioned two-tiered system—which differentiated between Chase's wealthiest clients and all others—was designed to ensure that Chase would receive the greatest amount of PPP loan origination fees it could at the smallest possible expense.

31.     As set forth above, the amount of a PPP loan origination fee depended upon the size of a PPP loan.  The maximum origination fee Chase could earn on a PPP loan less than or equal to $350,000 was $17,500.  In contrast, if Chase originated a PPP loan for the maximum amount of $10 million, it would earn an origination fee of $100,000.

32.     Since Chase's wealthiest clients sought the largest PPP loans, the origination fees associated with those clients' PPP loans were greater than the origination fees for the PPP loans requested by Chase's smaller clients.  In addition, because the time and expense associated with processing one large PPP loan application is significantly less than processing many smaller PPP loan applications, it was more economical for Chase to process the largest PPP loan applications first.

33.     Moreover, because the PPP involved a limited fund of money that was supposed to be distributed on a "first-come, first-served" basis, Chase knew that it would not be able to process every single PPP loan application it received before the PPP's funds were exhausted.  This incentivized Chase to process the largest PPP loan applications first because (1) it ensured that Chase got the largest amount of origination fees it could before the first round of PPP's funds were depleted, and (2) after the first round of PPP's funding was used up, it would be unnecessary for Chase to review any more PPP loan applications, thereby reducing Chase's costs.

34.    Put simply, Chase was able to get the most "bang for its buck" by prioritizing its wealthiest clients' PPP loan applications over those of its other clients.

### The Effect of Chase's Practices

35.    By processing the PPP loan applications of its wealthiest clients first—instead of processing the PPP loan applications it received on a "first-come, first-served" basis as it promised and was *required* by the Rules to do—Chase secured a greater share of the highly coveted PPP funds allocated by Congress—to the detriment of Plaintiff and the other Class members—before the first round of funds were exhausted.

36.    Chase received hundreds of thousands of PPP loan applications. More than 300,000 of those PPP loan applications were submitted by customers of Chase's business banking unit, which serves smaller firms. About 18,000 of those 300,000 PPP loan applications submitted between April 3, 2020 and April 16, 2020 were funded, for a 6% success rate. In contrast, nearly all of Chase's 8,500 larger (and sometimes more sophisticated) customers who applied for PPP loans in the same time frame received them.

37.    According to the SBA, Chase disbursed approximately $14 billion in loans through the first round of the PPP, the largest figure in the banking industry. However, as a result of Chase's decision to prioritize its wealthier customers, Chase's average approved loan size was $515,304.00. This figure also led the industry by a wide margin. A table created by the SBA reflecting these figures—Chase is "Lender 1"—is included below:[15]

---

[15] https://www.sba.gov/sites/default/files/2020-04/PPP%20Deck%20copy.pdf

## PPP Lenders – Highest Approved Dollars

| Lender | Approved Loans | Approved Dollars | Average Approved Size |
|---|---|---|---|
| 1 | 27,307 | $14,071,396,427 | $515,304 |
| 2 | 32,097 | $10,309,843,746 | $321,209 |
| 3 | 21,062 | $9,612,090,368 | $456,371 |
| 4 | 33,594 | $7,778,303,458 | $231,538 |
| 5 | 27,929 | $6,555,028,971 | $234,703 |
| 6 | 25,820 | $6,114,676,731 | $236,819 |
| 7 | 26,238 | $6,057,787,355 | $230,878 |
| 8 | 10,681 | $4,406,088,115 | $412,516 |
| 9 | 14,215 | $4,356,840,783 | $306,496 |
| 10 | 9,457 | $4,267,336,254 | $451,236 |
| 11 | 12,001 | $4,190,129,500 | $349,148 |
| 12 | 25,151 | $3,889,799,524 | $154,658 |
| 13 | 9,673 | $3,392,990,074 | $350,769 |
| 14 | 10,642 | $2,978,045,260 | $279,839 |
| 15 | 40,746 | $2,966,427,908 | $72,803 |

Approvals through 4/16/20

SBA

### The Harms to Plaintiff and Class Members

38.    Chase's prioritization of PPP loan applications seeking higher loan amounts in derogation of the Rules and its own representations to applicants harmed Plaintiff and Class members in several different ways, as set forth below.

39.    First, Plaintiff and Class members were qualified for, and were entitled to receive, PPP loans. Plaintiff and Class members timely submitted complete PPP loan applications to Chase demonstrating that they were qualified for, and were entitled to receive, PPP loans.

40.    Plaintiff and Class members submitted their PPP loan applications to Chase as soon as possible after Chase began accepting PPP applications. On information and belief, Plaintiff and Class members submitted their PPP loan applications *before* several of Chase's wealthier clients who received PPP loans.

41.    However, because Chase chose to process its wealthiest client's PPP loan applications first, regardless of when they were submitted, the funds allocated to the PPP were exhausted by the time Plaintiff's and Class members' applications were processed, leaving no

money for them.  As a result, Plaintiff and Class members did not receive PPP loans until at least April 27, 2020, when Phase 3.5 was enacted.

42.     Had Chase actually complied with its promise that "funds will be loaned on a first-come, first-served basis"[16] and the Rules, Plaintiff's and Class members' PPP loan applications would have been processed and approved before the first round of the PPP's funding was exhausted.

43.     In other words, but for Chase's failure to timely process Plaintiff's and Class members' PPP loan applications—and do so in the proper, "first-come, first-served" order—Plaintiff and Class members would have received PPP loans in the first round of funding.

44.     Therefore, as a direct result of Chase's unconscionable and deceptive behavior, Plaintiff and Class members were denied PPP loans which they otherwise would have received and were delayed access to PPP funds until at least April 27, 2020, when Phase 3.5 was signed into law.

45.     Second, even if Plaintiff and Class members did *not* submit their PPP loan applications before several of Chase's wealthier clients who received PPP loans, their failure to do so was the result of Chase's unconscionable and unfair decision to provide its wealthier clients with individualized attention while ignoring its smaller clients—such as Plaintiff and members of the Class.  As noted above, Chase's smaller clients—*i.e.*, Plaintiff and Class members—were required to submit "preliminary requests"—through a slow, backed-up online portal, which "was only sporadically accessible"—before they were even granted the *opportunity* to submit their actual PPP loan applications.  Chase's wealthier clients were not required to do so.

---

[16] https://privatebank.jpmorgan.com/gl/en/insights/planning/small-business-owners-cares-act-faq

46.     This two-tiered system ensured that Chase's wealthier clients would be able to submit their PPP loan applications first.  Indeed, Plaintiff and Class members did not even have the ability to submit PPP loan applications to Chase until *after* their "preliminary requests" were granted.

47.     In other words, Chase's adoption and implementation of the aforementioned two-tiered system allowed it to "stack the deck" against its smaller customers, rendering its promises to process applications on a "first-come, first-served" basis meaningless.  This guaranteed Chase the outcome it desired, as it enabled Chase to (1) originate the largest number of large PPP loans before the program's funds were exhausted, and (2) avoid having to process many smaller PPP loan applications because there was no reason to do so after the PPP's funds had been allocated.

48.     Even if it is technically true that Chase granted PPP loan applications on a "first-come, first-served" basis, Chase's conduct did not comply with the spirit of the law, evidences a significant lack of good faith and fair dealing, and amounts to an unfair and unconscionable business practice prohibited by law.

49.     As a result of Chase's unfair and unconscionable business practices, Plaintiff and Class members were denied the meaningful opportunity to obtain a PPP loan in the first round of funding.  Indeed, even if Plaintiff and Class members entered the PPP loan application "queue" as soon as possible, they were already behind wealthier customers who had been given the opportunity to enter the "queue" sooner.

50.     Third, because Plaintiff and Class members were unaware of the fact that Chase—contrary to its affirmative representations—prioritized its wealthier clients' PPP loan applications over their applications, as well as Chase's unfair and unconscionable practices—*i.e.*, the impediments Chase created to hinder their ability to quickly submit PPP loan applications—

Plaintiff and Class members had no reason to suspect that it was inadvisable to submit PPP loan applications to Chase, instead of some other lender. This is significant because, under the terms of the PPP and the Rules, borrowers are only entitled to one PPP loan, and many banks precondition the ability to apply for a PPP loan on the fact that a borrower has not applied for a PPP loan elsewhere.

51.     In other words, Plaintiff and Class members had one chance to submit a PPP loan application. As such, whether that application would be treated fairly, and in compliance with the law, was a material fact to Plaintiff and Class members.

52.     Had Plaintiff and Class members known that Chase prioritized its wealthier customers—which resulted in a decreased chance that they would receive PPP loans from Chase through the first round of funding—Plaintiff and Class members would not have sought PPP loans from Chase, and would have applied with other lenders.

53.     Therefore, as a direct and proximate result of Chase's misrepresentations and omissions, Plaintiff and Class members were deceived into submitting what were essentially meaningless applications to Chase instead of seeking PPP loans from other lenders. This harmed Plaintiff and Class members because it deprived them of a meaningful opportunity to receive PPP loans until April 27, 2020, when Phase 3.5 was signed into law, and caused them to incur the costs—*i.e.*, their time, expenses, etc.—associated with completing meaningless PPP loan applications.

## FACTS RELATIVE TO PLAINTIFF

54.     VR Consultants has been banking with Chase for over ten years as one of Chase's "Premier Business" clients.

55.     VR Consultants is a small information technology consulting outfit specializing in providing quality information technology solutions and management consulting to all industry verticals.

56.     Prior to the COVID-19 pandemic, VR Consultants projected a gross annual revenue of $220,000. Due to the pandemic, VR Consultants now anticipates a seventy percent (70%) decrease in revenue effective May 2020. VR Consultants' billable hours have already been cut for April 2020, and with the anticipated seventy percent (70%) drop in revenue, VR Consultants will be forced to completely eliminate its payroll and staff as well as any prospects of business expansion. VR Consultants relies heavily on travel to visit prospective clients and meet with them to obtain new business. With the current travel restrictions in place, it is nearly impossible for VR Consultants to generate new business.

57.     On April 2, 2020, Chase sent VR Consultants e-mail correspondence advising how Chase would "announce" when Chase could start accepting PPP applications. *A true and accurate copy of the email is attached as Exhibit #1*.

58.     On April 9, 2020, at approximately 9:35 p.m.—6 days *after* Chase began accepting PPP loan applications from its wealthier clients—Chase sent VR Consultants the confirmation email that Chase was now ready to begin accepting applications for the PPP program. *A true and accurate copy of the email is attached as Exhibit #2*.

59.     That same evening, on April 9, 2020, VR Consultants submitted its complete PPP application to Chase. Chase used an automated loan calculator which was based on Plaintiff's monthly payroll. For VR Consultants, Chase calculated a loan amount of $27,500.00.

60.     At the time Plaintiff submitted its PPP loan application to Chase, Plaintiff was qualified for, and was entitled to receive, a PPP loan.  This was readily apparent from the face of Plaintiff's PPP loan application.

61.     Plaintiff submitted its PPP loan application on the first day Chase permitted it to do so.  Had Chase permitted Plaintiff to submit its application earlier—*e.g.*, on April 3, 2020—Plaintiff's application would have been submitted that same day.  In other words, had Plaintiff been given the same opportunities that Chase's wealthier clients were given relative to submitting PPP loan applications, Plaintiff's application would have been submitted much sooner.

62.     Nevertheless, on information and belief, Plaintiff submitted its PPP loan application to Chase *before* at least one of Chase's wealthier clients who received a PPP loan.

63.     Two days later, on April 11, 2020, Chase sent VR Consultants an email confirming receipt of the PPP application and advising Plaintiff "you'll receive your loan decision by email from Chase soon." ***A true and accurate copy of the email is attached as Exhibit #3***.

64.     On April 17, 2020, Chase sent VR Consultants an email which indicated "we have learned the SBA has approved loans that will exhaust all the funding available for the initial round." ***A true and accurate copy of the email is attached as Exhibit #4***.

65.     On April 19, 2020, Chase provided VR Consultants with its first substantive update regarding VR Consultants' PPP application. Chase advised that the application was in "Stage 1, Application received," and Chase indicated that there were more than 100,000 applications ahead of VR Consultants at Chase. ***A true and accurate copy of the email is attached as Exhibit #5***.

66.     On May 1, 2020, four (4) days after Phase 3.5 was signed into law, Chase advised VR Consultants that its SBA PPP loan request was approved. ***A true and accurate copy of the email is attached as Exhibit #6***.

67.     In reliance upon Chase's promises that it would process PPP loan applications on a "first-come, first-served" basis, Plaintiff chose to submit its one and only application to Chase. Had Plaintiff known that these representations were false, Plaintiff would not have sought a PPP loan from Chase, and would have applied with another lender.

68.     Similarly, had Plaintiff been aware that Chase had adopted the aforementioned two-tiered approach to processing PPP loan applications, and of the resulting decreased probability that it would be approved for a PPP loan, Plaintiff would not have sought a PPP loan from Chase, and would have applied with another lender.

69.     Had Chase actually complied with its promise that "funds will be loaned on a first-come, first-served basis"[17] and the Rules, Plaintiff's PPP loan application would have been processed and approved before the PPP's initial round of funding was exhausted.

70.     Plaintiff's application also would have been processed and approved before the PPP's funding was exhausted had Chase permitted Plaintiff to submit its PPP loan application sooner—*e.g.*, on April 3, 2020.

71.     As a direct and proximate result of Chase's conduct described herein, VR Consultants was deprived of a meaningful opportunity to obtain a PPP loan through the initial round of funding, from either Chase or another lender, and was unable to obtain a PPP loan that it otherwise would have obtained until Phase 3.5 was enacted.

72.     Had Plaintiff timely received the PPP loan to which it was entitled (and would have timely obtained but for Chase's acts and omissions described herein), it would have been able to maintain its business operations at levels similar to those present before the COVID-19 pandemic. However, because Plaintiff did not receive the PPP loan it requested, its billable hours for the

---

[17] https://privatebank.jpmorgan.com/gl/en/insights/planning/small-business-owners-cares-act-faq

month of April 2020 were reduced, resulting in decreased revenue (as exemplified below). Plaintiff also was unable to generate new business and conduct regular promotional activities and travel during April 2020, which has, and will continue to, result in further decreased revenue.

73.     The delay and deprivation of desperately needed funds has caused irreparable injury to Plaintiff in the form of revenue and clients lost that it will never be able to recoup.  VR Consultants' clients rely on timely delivery of these IT solutions based on an agreed Statement of Work (the "SOW"). If VR Consultants is unable to provide any crucial project deliverables by the dates outlined in the SOW, VR Consultants faces heavy consequences. VR Consultants' highest profile and oldest client is Client X[18]. VR Consultants was in the midst of a major project for Client X that was due for final delivery during the month of April 2020 (the "Project"). A member of VR Consultants' staff who was on payroll was the primary resource in implementing and delivering the Project to Client X as only this team member possessed the knowledge required to service Client X and bring the Project deliverable to completion prior to the SOW's April 30, 2020 deadline. Due to VR Consultants' inability to make payroll for the second half of April 2020, VR Consultants was forced to furlough this staff member who was responsible for delivering the Project to Client X. As a result, Client X was dissatisfied with VR Consultants' service and delayed payment until the work was completed. However, the work could not be completed until VR Consultants was able to bring this member back on payroll. Due to the delays in delivering the Project to Client X, Client X cut off all commitments for any future business with VR Consultants, removing a significant source of future potential revenue for it.

---

[18] The name of the client is anonymously denoted as Client X in order to prevent any (further) damage to the business relationship between VR Consultants and Client X beyond the damage that Chase caused.

## CLASS ALLEGATIONS

### *Proposed Class Definition*

74.     **Class Definition:** Pursuant to Fed. R. Civ. P. 23, Plaintiff brings this action, individually, and on behalf of a class of similarly situated individuals and entities (the "Class"), defined as follows:

> All persons and business entities in the State of New Jersey who (1) met the criteria for eligibility and were not otherwise ineligible between February 15, 2020 and June 30, 2020 for a PPP loan; (2) applied for a PPP loan through Chase; and (3) did not receive a PPP loan between April 3, 2020 and April 27, 2020.

> Excluded from this Class are: (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

75.     **Numerosity and Ascertainability:** The Class is so numerous that joinder of all members is impracticable, as it is likely comprised of thousands of self-employed persons and businesses.  Indeed, as of April 16, 2020, 33,519 PPP loans were *approved* in New Jersey.  Given Chase's PPP loan approval rate of approximately 6% for smaller business, such as Plaintiff and members of the Class, the number of individuals whose PPP applications were *not* granted is significantly higher.  Class members can easily be identified through Chase's records, as they all would have submitted PPP loan applications—which contain their names, contact information, etc.—to Chase.

76.     **Commonality and Predominance:** There are common questions of law and fact subject to answers common to all Class members that predominate over any questions affecting only individual members, including but not limited to:

a.    Whether Chase complied with applicable SBA Rules in processing and granting PPP loan applications in New Jersey;

b.    Whether Chase had a policy and/or practice of prioritizing large PPP loans to larger, wealthier businesses;

c.    Whether Chase processed PPP loan applications on a "first-come, first-served" basis, as it represented and was required by law to do;

d.    Whether Chase made false representations regarding the PPP loan application process;

e.    Whether Chase committed unconscionable business practices by processing PPP loan applications in an order other than "first-come, first-served";

f.    Whether Chase committed unconscionable business practices by adopting a two-tiered system that prioritized its wealthier customers' PPP loan applications over Plaintiff's and Class members' applications;

g.    Whether the nature of the PPP application process created a duty on the part of Chase to disclose material information relating to the PPP loan applications;

h.    Whether Chase actively concealed and misrepresented material facts that the loan applications were not being processed on a "first-come, first-served" basis and that it was prioritizing its preferred clients;

i.    Whether Chase concealed or misrepresented material facts with knowledge of the fact's materiality and falsity and/or with such utter disregard and recklessness as to infer knowledge of its falsity; and

j.      Whether Chase's conduct constituted an unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*;

k.      Whether Chase's conduct constituted the knowing, concealment, suppression, or omission of any material fact with intent deception under the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*;

l.      Whether Plaintiff and Class members had a protectable interest in the proper processing of their PPP loan applications and/or receiving PPP loans;

m.      Whether Chase's acts and omissions described herein constitute malice;

n.      Whether there is a reasonable likelihood that Chase's actions and misrepresentations caused Plaintiff and Class members to lose the ability to meaningfully apply for, and receive, PPP loans;

o.      Whether Chase tortuously interfered with Plaintiff's and Class members' prospective economic advantage (*i.e.*, their ability to meaningfully apply for, and receive, PPP loans); and

p.      Whether Class members are entitled to damages and the measure of such damages.

77.     **Typicality:** Plaintiff's claims are typical of the Class because Plaintiff and all Class members were deceived by Defendants' unfair, unlawful, and fraudulent PPP loan application and approval practices, as alleged herein. Moreover, the factual and legal bases of Defendants' liability to Plaintiff and each Class member are substantially similar.  Indeed, Plaintiff and Class members

were each harmed in the same way as a result of Defendants' actions and misrepresentations described herein.

78.     **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff has no interest that is antagonistic to those of the Class and is ready and willing to bring this class action in a representative capacity on behalf of the Class.

79.     Moreover, as set forth below, Plaintiff's counsel will fairly and adequately prosecute the case on behalf of Plaintiff and the Class.

80.     The Dann Law Firm, PC has experienced trial attorneys who have engaged in extensive trial practice and have considerable experience in all aspects of class and mass tort litigation from several other class action and mass tort cases, including class action and mass tort cases against lenders and loan servicers.  The Dann Law Firm, PC has the necessary skills, expertise, and competency to adequately represent Plaintiff's interests and those of the class.

81.     Zimmerman Law Offices, P.C. has experienced trial attorneys with decades of experience in prosecuting class actions, such as this, throughout the nation, including class actions against lenders and loan servicers.

82.     Denbeaux and Denbeaux has extensive experience litigating claims under the New Jersey Consumer Fraud Act and possesses the necessary skills, expertise and competency to adequately represent Plaintiff's interests and those of the Class.

83.     Law Offices of Lee Perman have represented consumers and small businesses for decades, and are experienced federal court litigators.

84.     **Superiority:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would

make it impracticable or impossible for proposed members of the Class to prosecute their claims individually. The trial and the litigation of Plaintiff's claims are manageable.

## COUNT ONE
### VIOLATION OF N.J.S.A § 56:8-2, THE CONSUMER FRAUD ACT
**(On behalf of the Class Against All Defendants)**

85.     Plaintiff restates paragraphs 1 through 84 in their entirety, as if fully rewritten herein.

86.     Plaintiff asserts this cause of action on behalf of itself and the Class.

87.     The New Jersey Consumer Fraud Act (hereinafter "CFA") prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate.

N.J.S.A. § 56:8-2.

88.     The term "unconscionable" under the CFA implies a lack of good faith, honesty in fact and observance of fair dealing.

89.     Chase committed an "unconscionable commercial practice" by subverting both the process and the intent of PPP loans through prioritizing large borrowers to the detriment of the small business applicants the funds were intended to support, like Plaintiff. Further, Chase unfairly made false and deceptive representations to PPP applicants and the public about the process which unfairly induced applicants to apply with Chase. Inducing a greater volume of PPP applicants was to the financial benefit of Chase and at the expense of Plaintiff and the other Class members, as Chase would have a greater number of wealthy customers' applications to process which would earn Chase large application fees.

90.     Chase's acts and practices were unconscionable because Chase was required to process the PPP loan applications of Plaintiff and the other Class members fairly on a "first-come, first-served" basis, but failed and refused to do so. Chase caused Plaintiff and the other Class members to submit PPP loan applications that were placed unfairly and unconscionably at the back of the line. Chase prioritized its own profits over compliance with the rules of the CARES Act.

91.     The gravity of the harm to members of the Class resulting from these unlawful acts and practices outweighed any conceivable reasons, justifications, and/or motives that Defendants had—in this case the desire to profit from PPP loans—for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendants engaged in unlawful business practices within the meaning of the CFA, N.J.S.A. § 56:8-1, *et seq*.

92.     Unlawful conduct under the CFA includes "deception, fraud, false pretense, false promise, misrepresentation."

93.     As set forth above, Chase committed deception, fraud, false pretenses, false promises, or misrepresentations about the loan approval process and the "focus" and "priorities" of the bank in processing and funding PPP loans. Chase's representations were made with the intent to generate public good will and to induce consumers, such as Plaintiff and the other Class members, to reasonably rely on those representations and choose Chase when making a decision about who to make their PPP loan application through.

94.     Chase's acts and practices as described herein deceived Plaintiff and the Class and were highly likely to deceive members of the consuming public. Plaintiff would not have applied for a PPP loan through Chase had Plaintiff been aware that Chase would unconscionably and unfairly place his application in the "back of the line." Had Plaintiff and the other Class members applied at a different bank, they could have obtained PPP funding in a more timely manner, or at

least maintained their proper place in line as required by the applicable Rules. Accordingly, Plaintiff and each member of the Class have suffered ascertainable loss as a direct result of Chase's practices described above.

**COUNT TWO**
**FRAUDULENT CONCEALMENT**
**(On behalf of the Class Against All Defendants)**

95.     Plaintiff restates paragraphs 1 through 84 in their entirety, as if fully rewritten herein.

96.     Plaintiff asserts this cause of action on behalf of itself and the Class.

97.     Due to the nature of the transaction and contemplated contract between them, Defendants owed a duty to Plaintiff and the Class to reasonably disclose facts material to that transaction and to not hide or obscure facts material to that transaction.

98.     At all relevant times, Defendants possessed and had exclusive knowledge of material facts not known to the Plaintiff and Class members, *i.e.*, knowledge of how the PPP applications were processed. Specifically, Chase prioritized large businesses borrowing large amounts of money instead of processing applications on a first-come, first-served basis.

99.     At all relevant times, Defendants actively concealed those material facts from the public and their PPP loan applicants, by intentionally omitting to disclose such facts and by intentionally misleading Plaintiff and the Class with affirmative statements that were not true.

100.    Even if Defendants made some partial representations, Defendants still made efforts to suppress material facts and did not fully disclose and contextualize the material facts known only to them.

101.    Plaintiff and the Class reasonably relied on Defendants' representations in choosing to apply for a PPP loan with Chase.

102.    As a direct result of Defendants' fraudulent concealment of facts material to the PPP loan application transaction, Plaintiff and the Class were induced to apply with Chase and as a proximate result suffered economic and financial harm to be proven at trial.

**COUNT THREE**
**TORTIOUS INTERFERENCE**
**(On behalf of the Class Against All Defendants)**

103.    Plaintiff restates paragraphs 1 through 84 in their entirety, as if fully rewritten herein.

104.    Plaintiff asserts this cause of action on behalf of itself and the Class.

105.    Under New Jersey law, "the tort of interference with a prospective economic advantage (tortious interference) contains four elements: (1) a protectable interest; (2) malice, the defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of a prospective gain; and (4) resulting damages." *E.g.*, *D'Agostino v. Gesher LLC*, 2014 WL 7475209, at *5 (N.J. Super. Ct. App. Div. 2015).

106.    As set forth above, a key component of the CARES Act was the creation of the PPP.  Under the PPP, small businesses—such as Plaintiff and members of the Class—had a legally protectable interest in applying for, and obtaining, PPP loans.

107.    Chase's acts, misrepresentations, and omissions described herein deprived Plaintiff and Class members of their legally protectable interest in applying for, and obtaining, PPP loans on a "first-come, first-served" basis.  In doing so, Chase acted with malice because it violated the express provisions of the Rules, and engaged in unfair and unconscionable business practices to deprive Plaintiff and Class members of a meaningful opportunity to apply for, and obtain, PPP loans on a "first-come, first-served" basis.

108.    As a result of Chase's acts and practices as described herein, Plaintiff and the Class members were deceived into submitting PPP loan applications to Chase that had no chance of being timely granted, in lieu of seeking PPP loans from other lenders.  Had Plaintiff and the other Class members applied at a different bank, they would have had a significantly more meaningful opportunity to timely obtain, and/or would have timely received, PPP funding during the initial round of funding.

109.    Chase's acts and omissions described herein delayed Plaintiff's and Class members' ability to obtain PPP loans, which in turn caused Plaintiff and Class members to reduce their workforce and their capacity to service their clients/customers.  As set forth above, Plaintiff and Class members were harmed as a result of this delay and the consequences thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff VR Consultants, Inc., individually, and on behalf of all others similarly situated, prays that this Court enter an order granting judgment against Defendants JP Morgan Chase & Co. and JP Morgan Chase Bank, N.A., jointly and severally, for the following:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B.    Designating Plaintiff as representative of the Class and its undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiff and the Class and against Defendants;

D.    Awarded Plaintiff and the Class members actual damages, statutory damages, and punitive damages, as allowed or required by law;

E.    Awarding Plaintiff and the Class attorneys' fees and costs, including interest thereon, as allowed or required by law; and

F.    Granting all such further and other relief as the Court deems just and appropriate.

Respectfully submitted,

*Javier L. Merino*
Javier L. Merino
Marc E. Dann (*pro hac vice* anticipated)
**The Dann Law Firm, PC**
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: (216) 373-0539
Fax: (216) 373-0536
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
*tom@attorneyzim.com*
Matthew C. De Re (*pro hac vice* anticipated)
*matt@attorneyzim.com*
Sharon A. Harris (*pro hac vice* anticipated)
*sharon@attorneyzim.com*
Jeffrey D. Blake (*pro hac vice* anticipated)
*jeff@attorneyzim.com*
**ZIMMERMAN LAW OFFICES, P.C.**
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Phone: (312) 440-0020 telephone
Fax: (312) 440-4180 facsimile
*www.attorneyzim.com*

Joshua W. Denbeaux
**Denbeaux & Denbeaux**
372 Kinderkamack Road, Suite 5
Westwood, NJ 07675
Phone: (201) 664-8855
Fax: (201) 666-8589
jdenbeaux@denbeauxlaw.com

Lee M. Perlman
1926 Greentree Road, Suite 100
Cherry Hill, NJ 08003
Phone: (856) 751-4224
Fax: (888) 635-5933
lperlman@newjerseybankruptcy.com

*Counsel for Plaintiff and the putative Class*

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues.


*Javier L. Merino*
Javier L. Merino
The Dann Law Firm, PC